Affirmed and Opinion filed January 17, 2006









Affirmed
and Opinion filed January 17, 2006

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-04-00718-CR

____________

 

KELVIN C. JOHNSON, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 230th
District Court

Harris County, Texas

Trial Court Cause No. 964,782

 



 

O P I N I O N

Appellant Kelvin C. Johnson appeals his
conviction for aggregated theft of more than twenty-thousand dollars and less
than one-hundred-thousand dollars.  After
finding appellant guilty, a jury assessed punishment at twenty years= confinement in
the Institutional Division of the Texas Department of Criminal Justice and a
$10,000 fine.  In three points of error,
appellant argues that (1) the evidence is legally and factually insufficient to
support his conviction; and (2) the trial court erred by allowing appellant to
represent himself.  We affirm.

Background








Between January 2003 and October 2003,
appellant met with seven different attorneys to discuss a potential personal
injury claim.[1]  Using several aliases, appellant claimed that
he had been injured in an offshore accident while working for Diamond Drilling
Company (ADiamond@).  Specifically, appellant told the attorneys
that he and his co-worker, John Dubois,[2]
had been unloading pipes when a cable on the crane broke, causing the heavy
pipes to fall on top of them.

Appellant, who frequently limped and
carried a cane when he met with the attorneys, claimed that he had been knocked
unconscious and that he had injured his knee, leg, and back.  Appellant said that he had undergone knee
surgery at University of South Alabama Hospital in Mobile and showed some
attorneys his scar.  Appellant claimed
that Dubois had been transported to Louisiana, where he remained in a
coma.  Appellant then informed the
complainants that orthopedic surgeon Dr. Alan Criswell was going to operate on
appellant=s back at Hermann Hospital in Houston.[3]  Appellant also told most of the complainants
that Dubois= wife Mary wished to be represented by the
same attorney as appellant.

Additionally, appellant claimed that
Diamond had offered to settle and that until recently, the company had been
paying his family=s living expenses.  However, when he met with the complainants,
appellant lamented that he could no longer pay his rent and that the landlord
was threatening to evict him, his wife, and their four small children.[4]









Believing appellant=s case to be
legitimate, the attorneys agreed to represent appellant pursuant to a
contingency fee agreement.  After
appellant provided one of several Beaumont addresses and what appeared to be
valid proof of identification, the attorneys advanced either checks or cash to
cover appellant=s various expenses. Appellant disappeared
immediately after receiving the money. 
Shortly thereafter, the attorneys discovered that appellant had never
worked for Diamond, that he had never been a patient at either the University
of South Alabama Hospital or Hermann Hospital, and that the home address he had
provided did not exist.  

Police eventually arrested appellant after
organizing a Asting@ operation with
complainants Edwards and Johnson. 
Appellant had discussed his case with attorney Edwards and believed that
Edwards was going to advance him $3,000 in cash.  When appellant met with Johnson, a private
investigator hired by Edwards, Johnson handed appellant an envelope that contained
a check made out to Edwards.  Police
arrested appellant as soon as he took possession of the check.

Pretrial Proceedings

Appellant=s case came before
the grand jury on Nov. 24, 2003. 
Alleging aggregate theft by deception, the indictment stated, in
relevant part, that appellant

heretofore on or about various
dates between May 21, 2003 and October 13, 2003, did then and there unlawfully,
acquire and otherwise control over [sic] property, other than real property
namely, money and one check, owned by Bill Edwards [sic] and/or Charlie
Johnson, and/or Larry Boyd, and/or D=Juana Parks, and/or Gerry Dunne, and/or Robert Zeither,
and/or J.P. Jay Hughes, and/or James W. Nobles, Jr., and/or R. Gary Stephens,
hereafter styled the complainants, pursuant to one scheme and continuing course
of conduct, and in an aggregate amount and value of more than twenty thousand
dollars but less than one hundred thousand dollars . . . .

 

For enhancement purposes, the indictment also alleged
that appellant had one prior conviction for felony theft.








About a month before trial, appellant
complained that he could not communicate with his attorney, Cedrick
Muhammed.  Asserting that he wished to
represent himself, appellant acknowledged that he would not Aget any special
breaks.@  In response to the court=s initial
questions about his education, appellant stated that he was forty-one years old
and had completed school through the ninth grade, although he was Awell-equipped like
a person who graduated.@ 
Appellant answered affirmatively when the court asked whether appellant
understood the charges against him and the possible punishment ranges; when the
court asked him to elaborate, he stated: AThere are three
cases, each are [sic] third degree felonies are [sic] enhanced by one prior
true felony which makes the punishment range two years to twenty years in the
punishment and a ten thousand dollar fine.@  When appellant expressed uncertainty about
the punishment range regarding the last offense, the district attorney
retrieved the file, which included the most recent cause number for the third
case and a copy of the indictment. 
Later, appellant also stated that he knew he would be required to serve
the punishment assessed by the jury if his conviction were upheld on appeal.

When the court asked about the extent of
appellant=s Aknowledge of
specific rules of criminal cases and what things you will have to do to
represent yourself,@ appellant responded: AI have to know
when to object what questions to be asked and at my trial what motions to be
filed.  To get rulings on my motion
[sic].  Ask questions to the witness that=s relevant to this
criminal case.@ 
Appellant also stated that he was familiar with the Rules of Evidence
and the Rules of Criminal Procedure and acknowledged that he needed to comply
with them at trial.  When the court asked
how appellant had become familiar with those rules, appellant replied that he
had begun to study them about four years earlier.  Appellant further explained that he read Athe Texas law
books@ and Aa lot of federal
government books,@ particularly Athe Court of
Criminal Procedure book.@ 
Appellant also revealed that he had represented himself in a
post-conviction writ and in a theft charge that was dismissed before trial.








When asked about the nature of voir dire,
appellant explained that there would be about sixty people in the jury pool,
that he and the district attorney each would have ten strikes, and that Ame and him
negotiate on what we see whoever we see that would benefit me or whoever
benefits him.@  In
response, the court informed appellant that while each side would have ten
strikes, no negotiation would occur. 
Appellant also admitted that he did not know the difference between a
peremptory challenge and a challenge for cause, and the court did not offer an
explanation.

Aware that his trial was less than a month
away, appellant had requested additional time to conduct legal research.  The court granted this motion but advised
that Aeven with all the
time in the law library that you want I don=t think you=ll be ready to try
a case in felony court.@ 
Appellant responded that he would indeed be ready and agreed with the
court=s statement that
his conduct at trial Awould be of critical importance to the
outcome of [his] case.@ 
Appellant also stated that he understood that conducting his defense
required more than simply telling the jury his side of the story.  Appellant also appeared to comprehend the
court=s warning that the
jury would not know about certain details of the case unless appellant abided
by the evidentiary rules.

Toward the end of the hearing, appellant
reiterated that although he had not consulted with Muhammed about his case or
arranged for any witnesses to appear on his behalf, he did not want Muhammed to
represent him.  Appellant stated that he
was aware that he would be representing himself throughout the whole trial and
acknowledged that the district attorney was a licensed, experienced attorney.  Appellant also stated that he had never been
found insane or incompetent and had never been treated for a mental illness; he
also responded affirmatively when the court asked whether he had the Amental capacity to
freely and voluntarily waive [his] right to representation by Mr. Muhammed and
represent [himself] at trial.@  Finally, at the end of the hearing, appellant
responded affirmatively when the court asked: ADo you freely and
voluntarily waive your right to have Mr. Mohammed [sic] represent you in trial
of these cases and telling [sic] this court that you still wish to represent
yourself in trial of these cases?@  Although the trial court appointed Muhammed
as standby counsel, appellant did not request his assistance at trial.

Trial Proceedings








Seven complainants testified against
appellant at trial.  First, Mississippi
attorney James Nobles testified that he had received a referral about a
potential client named Larry Ray Brown, who turned out to be appellant.  Nobles met appellant at a hotel near Hobby
Airport in Houston on January 10, 2003. 
As proof of identification, appellant showed Nobles a photo
identification card from Mississippi and provided Nobles with his social
security number and a Beaumont address.

 
Appellant told Nobles that he had been injured in an accident in April
or May of 2002 while working for Diamond Drilling Company.  Appellant stated that he had been working
aboard an oil rig called the Ocean Tower, which was located near Petit Bois
Island.  Drawing a diagram, appellant
explained that he and his coworker Chris Hamilton had been unloading pipes when
a crane malfunctioned and dumped the pipes on top of them.  Appellant, who had been limping, claimed that
he had been knocked unconscious and had undergone two knee surgeries after the
accident; he also claimed that Dr. Wallace at Hermann Hospital was going to
perform back surgery on him.  Appellant
stated that Hamilton, who was in Louisiana, was in a vegetative state because
the pipes had struck him in the head. 
Appellant offered to ask Hamilton=s wife if she also
needed legal representation.

Appellant told Nobles that Diamond wanted
to settle the case for $375,000.   After
Nobles agreed to represent him, appellant further explained that Diamond had
reneged on its promise to pay his family=s rent, and that
he and his wife Vanessa were struggling to care for their children, including a
sick baby who was only a few weeks old. 
Appellant said that his landlord=s name was Randy
Jackson; when Nobles spoke with Jackson over the phone, the purported landlord
confirmed that appellant owed him $3,400. 


Nobles gave appellant a one-hundred-dollar
bill and also wired $4,000 by Western Union. 
Appellant notified Nobles when he had received the money.  When Nobles called Hermann Hospital several
days later for an update on appellant=s surgery, he
learned that no one named Dr. Wallace worked there.  Nobles promptly sent a letter to the Beaumont
address that appellant had provided, but it returned to him marked as Ano such address.@








On cross-examination, Nobles acknowledged
that although he had filed an official complaint, he never swore in an
affidavit that appellant had stolen from him. 
Nobles also admitted that while his credit card showed a money transfer
by Western Union, it did not show that appellant was the person who received
the money.  Appellant also tried to
establish that the claim against Diamond was frivolous, and that under the
terms of the fee agreement, appellant would not owe Nobles any money if Nobles
failed to win damages on a frivolous claim.

Next, Mississippi attorney Jay Hughes
testified that he met appellant, who was using the name Randy Lynn Jackson, at
Hobby Airport on May 21, 2003.  Appellant
told Hughes that he had been working for Diamond Drilling Company on an oil rig
called the Ocean Nugget.  Appellant
claimed that he had been injured in an accident that occurred near Dauphin
Island on September 28, 2002.  Sketching
a diagram, appellant explained that he and his coworker John Charles Dubois had
been unloading pipes in preparation for an inspection by OSHA (Occupational
Health and Safety Administration) when a cable on the crane snapped and dropped
the load of pipes onto them.  Another
worker, Chris Hamilton, witnessed the accident. 


Appellant stated that he had been in a
coma for twenty hours and had injured his left knee, his right leg and ankle,
and several vertebrae.  According to
Hughes, appellant appeared to exhibit symptoms consistent with those injuries,
including pain radiating down his left leg. 
Appellant told Hughes that he had spent thirteen days in the University
of South Alabama Hospital undergoing reconstructive surgery; additionally, Dr.
Criswell was scheduled to operate on appellant=s back at Hermann
Hospital the very next day.  According to
appellant, Dubois suffered a cracked scull and had been in a coma in a
Louisiana hospital for six months; his wife Mary wanted appellant to find an
attorney to represent her as well. 
Appellant claimed that his wife Vanessa possessed detailed medical
records related to the claims; however, since Vanessa had stayed at home with a
sick child, appellant promised to deliver the records to Hughes the next
day.  








Appellant also told Hughes that Diamond
had offered to settle for $600,000. 
Diamond had also provided appellant=s family with a
rental house in Beaumont, where he lived with Vanessa and their four children,
including a seven-to-eight-week-old baby. 
However, Diamond had stopped paying the rent, and appellant needed
roughly $5,000 for rent and utilities. 
When Hughes spoke with appellant=s landlord about
the arrearage, the landlord threatened to evict appellant=s family
immediately.  Hughes then gave appellant
$5,000 in cash because the landlord would not accept checks.[5]  After appellant failed to appear for surgery
the next day, Hughes telephoned him and the purported landlord, but to no
avail. 

On cross-examination, Hughes testified
that he had contacted the Houston office of the FBI as well as the district
attorney=s office.  He also acknowledged that the meeting had not
been recorded and that a notary had not been present.  Appellant attempted to establish that Hughes
had consented to giving him the money, that appellant had not threatened Hughes
physically, and that Hughes had never filed an official complaint.  Appellant also tried to establish that the
contingency fee agreement provided that Hughes would cover all expenses related
to the case, and that if Hughes did not win money after a trial, appellant
would owe him nothing.

The same day that he met with Hughes,
appellant also met with Beaumont attorney D=Juana Parks at a
hotel in Houston.  Still using the name
Randy Lynn Jackson, appellant told Parks that although he lived in Beaumont, he
was currently in Houston because his child was in a hospital there.  Appellant also said that his wife=s name was Vanessa
and that they had four children, including a seven-and-a-half-week-old baby.








Limping and carrying a cane, appellant
reiterated that he had been injured on the Ocean Nugget while working for
Diamond.  The accident occurred near
Dauphin Island on September 28, 2002. 
According to appellant, toolpusher John Henison had asked appellant and
coworker John Dubois to unload pipes from a supply barge because he expected a
visit from OSHA.  A man named Mr.
Bradford, who worked for Exxon, was also present.  Parks testified that appellant drew a diagram
and explained that the accident had occurred because Diamond=s crane was
broken, and the men were forced to use an Exxon crane that lacked the proper
safety equipment.

Appellant told Parks that the load of
pipes fell, striking appellant and hitting Dubois in the head.  Appellant claimed that he had injured his
knee, ankle, and back, and had been unconscious for twenty hours.  Appellant told Parks that he had already had
reconstructive surgery on his left knee at the University of South Alabama
Hospital, and that Dr. Alan Criswell was going to operate on appellant=s back the next
day at Hermann Medical Center.  Appellant
also stated that Diamond had offered to settle the case for $400,000 if
appellant would testify that Dubois had been at fault in the accident.

Parks testified that she agreed to
represent appellant and that he signed a contract with her firm, Provost &
Umphrey.  Prior to their meeting, she and
appellant had discussed his financial situation; after appellant signed the
representation contract, Parks gave him a $5,000 check from her firm.  Parks testified that appellant cashed the
check the next morning and that the check was marked with the Arkansas
identification number and date of birth that appellant had provided.

The next day, Parks called the hospital to
check on appellant and learned that there was no registered patient named Randy
Lynn Jackson.  Parks testified that she
then called appellant=s cell phone, and he told her that the
surgery was scheduled for the following day. 
Parks then contacted Dr. Criswell, a well-known orthopedic surgeon, who
told her that he did not have a patient named Randy Lynn Jackson.  Parks also attempted to contact appellant=s landlord,
Michael Henison; Parks testified that the person who answered the phone sounded
nervous, and that she was unable to reach Henison.








On cross-examination, Parks testified that
appellant had cashed the check before she could stop payment on it.  She also acknowledged that appellant did not
physically take the check from her and that she had not signed an affidavit
under oath.  Appellant also tried to
establish that because the contract contained an arbitration clause, the
resolution of any differences should be a civil rather than a criminal
matter.  Appellant also insinuated that
Parks was responsible for her own financial loss because she should have
investigated the validity of the claim more thoroughly before giving the check
to appellant.

Another Texas attorney, R. Gary Stephens,
testified that he met appellant, who was using the name Randy Jackson, on June
12, 2003.  At the meeting, appellant
presented a photo identification from Arkansas, although a bleach spot obscured
most of the picture.  Appellant also gave
Stephens a Beaumont address and his driver=s license number,
but he did not have the license with him.

Appellant told Stephens that he had been
injured in an offshore accident on September 28, 2002 while working for
Diamond.  Stephens testified that
appellant drew a diagram and explained that the accident had occurred when he
and coworker John Dubois were aboard the Ocean Nugget, unloading pipes with an
Exxon crane.  According to appellant, Mr.
Bradford, the  Exxon Acompany man,@ wanted the work
completed before OSHA arrived the next day. 
Appellant told Stephens that the pipes fell, knocking appellant
unconscious and injuring his knee and back; appellant also mentioned that
another worker, Chris Hamilton, had witnessed the accident.   Appellant stated that Dubois, whose injuries
were more severe, was comatose in a hospital in Louisiana.  Showing Stephens his scar, appellant
explained that he had had surgery on his knee, leg, and ankle, and had stayed
in the University of South Alabama Hospital for fourteen days.   Appellant also stated that he had previously
consulted with Dr. Blackwell and that Dr. Criswell was going to perform
additional surgery on his back. 

Stephens testified that appellant revealed
his financial troubles after signing the contingency fee contract.  Appellant told Stephens that he and his wife
Vanessa had four children, and that their landlord was named Michael
Henderson.  According to Stephens,
appellant requested $7,500; Stephens agreed to advance $6,000 and told
appellant that he would advance the remaining $1,500 after further
investigation of the case.








Shortly thereafter, Stephens contacted the
hospital where Vanessa allegedly worked 
and discovered that there was no such employee.  Likewise, when Stephens contacted Diamond, he
learned that appellant had never worked there. 
Stephens testified that he tried to stop payment on the $6,000 check,
but appellant had already cashed it.  On
cross-examination, appellant again tried to establish that under the
contingency fee agreement, if the attorney did not win money for appellant at a
trial, then appellant would owe nothing.

Missouri attorney Gerry Dunne testified
that he met appellant on August 10, 2003. 
At the meeting, appellant showed Dunne a photo identification card
bearing the name Scott Lamb; a woman claiming to be his wife Rosalyn
accompanied appellant to the meeting. 
Limping and using a cane, appellant stated that he had been injured on
the Ocean Nugget, an oil rig maintained by Exxon, while he was working for
Diamond.  Appellant told Dunne that the
accident happened on October 27, 2002.  

Using two diagrams, appellant illustrated
the proper and improper methods of handling supplies and gave his standard
account of how the accident had occurred. 
Showing Dunne his scar, appellant stated that he had already had surgery
on his leg and knee and that Dr. Blackwell was going to operate on his back in
a week.  Appellant mentioned that his
friend John David Dubois also had been injured; appellant told Dunne that
Diamond had offered him a $150,000 settlement in exchange for testimony that
Dubois had been at fault.  According to
Dunne, appellant also said that Dubois= wife Mary  needed legal representation.

Dunne testified that after he decided to represent
appellant, appellant and his female companion signed the contract as Scott and
Rosalyn Lamb.  Claiming that he had not
been paid since the accident, appellant told Dunne that he needed $10,000 in
cash.  After informing appellant that
Missouri law did not allow attorneys to advance funds directly to clients,
Dunne referred appellant to Injury Case Funding, a company owned by complainant
Robert Zeither.  The company agreed to
advance $6,000, and appellant notified Dunne when he had received cash from
Western Union.[6]








Dunne further testified that around the
same time, Mary Dubois called his office from 
Lafayette, Louisiana and asked Dunne to represent her.  Dunne mailed her the relevant paperwork, but
it came back as undelivered.  Similarly,
a letter that Dunne had sent to appellant=s Beaumont address
was returned because no such address existed. 
On cross-examination, appellant tried to establish that the case should
be tried in civil court.

Houston attorney Larry Boyd testified that
he met appellant, who was using the name Randy Lynn Jackson, at a hotel on June
25, 2003.  Appellant was limping and
using a cane,  and was accompanied by his
wife Vanessa.  Appellant showed Boyd an
Arkansas driver=s licence with a photograph and said that
he lived on Magnolia Street in Beaumont.

Appellant told Boyd that he and a
coworker, whose last name was Dubois, had been injured on a rig called the
Ocean Nugget when a load of pipe fell on them. 
The accident occurred on September 28, 2002; witnesses included
toolpusher John Hinson, roustabout Chris Hamilton, and Exxon company man Mr.
Bradford.  Appellant claimed that he had
been knocked unconscious and had stayed at the University of South Alabama
Hospital for sixteen days.  Appellant
told Boyd that he had already had some surgery but needed more operations on
his knee, leg, ankle, and back.  Appellant
said that he had previously consulted with Dr. Blackwell and that Dr. Criswell
was going to perform the additional procedures. 
Appellant also told Boyd that Dubois was in a coma in Louisiana and that
his wife Mary wanted appellant=s attorney to
represent her as well.  Appellant also
mentioned that Diamond had offered to settle for $400,000.

Boyd testified that after appellant and
Vanessa had signed the power of attorney, appellant informed him that they were
behind in their rent and were going to be evicted.  Appellant requested $5,000 to care for their
four children, including an eight-and-a-half-week-old baby, and to cover his
medical expenses.  Boyd gave appellant a
$5,500 check, which appellant cashed the very same day.  The check was marked with the same date of
birth and Arkansas identification number as appellant had used previously.








Boyd testified that he tried
unsuccessfully to stop payment on the check and to contact appellant on his
pager after learning that the address appellant had provided did not
exist.  Boyd also learned that the social
security number appellant had provided belonged to someone else.

On cross-examination, appellant again
argued that under the contract, he was not obligated to pay Boyd if Boyd did
not win any money at a trial.  Appellant
also suggested that Boyd was at fault because he had failed to investigate
appellant=s case thoroughly before advancing the
money.

Texas attorney Bill Edwards testified that
he first spoke with appellant, who was using the name Scott Lamb, on October 6,
2003.  Over the phone, appellant relayed
the story about the accident aboard the Ocean Nugget, which he claimed had
occurred on November 28, 2003 near Dauphin Island.  Appellant informed Edwards that Dr. Criswell
was treating appellant=s injured knee and back and said that
Dubois was still in a coma in Louisiana. 
Appellant also told Edwards that Dubois= wife, Mary,
planned to hire the same attorney as appellant, and that Diamond had offered
him $450,000 to settle the case.

After an unsuccessful attempt to meet with
appellant, Edwards became suspicious and began to investigate appellant=s story.  When a representative from Diamond told
Edwards that several lawyers had called Diamond about the alleged accident,
Edwards contacted the authorities.

Wanting to catch appellant in the act,
Edwards agreed to represent him. 
Appellant and his wife signed the representation contract as Scott and
Rosalyn Lamb.  Appellant also provided
Edwards with copies of the purported settlement offer from Diamond, which bore
the signature of a man who had already retired from the company, as well as
copies of a social security card and other forms of identification bearing the
name AScott Lamb.@  Edwards testified that appellant also produced
copies of medical bills and a check stub for his living expenses; however, the
bills were dated before November 28, 2003, the date on which appellant claimed
the accident had occurred.








Edwards testified that after appellant
requested $3,000 in cash to be wired to a store in Harris County, Edwards and
the authorities organized a Asting@operation.  Edwards arranged for investigator Charlie
Johnson to meet appellant at Hobby Airport on October 13, 2003, ostensibly to
give appellant the money in person.  When
appellant arrived, limping and carrying a cane, he reiterated what he had
already told Edwards and said that his back surgery was scheduled for the next
day at Hermann Hospital.  At that point,
Johnson agreed to give appellant the money; however, instead of cash, Johnson
handed appellant an envelope containing a $3,000 check that Edwards had made
out to himself.  Johnson testified that
appellant was displeased about receiving a check, so Johnson gave him forty
dollars in cash.  When appellant accepted
the envelope, police promptly arrested him.

On cross-examination, Edwards acknowledged
that he never signed an affidavit regarding the criminal case against
appellant.  Edwards also acknowledged
that the check appellant had accepted was written to William R. Edwards.  Consequently, appellant argued that no theft
had occurred because he had taken a mere piece of paper and Edwards had not
lost any money.  On cross-examination,
Johnson stated that appellant had not stolen anything from him.

Officer Gordon Michael Garrett of the
Houston Police Department testified that he filed the charge against appellant
and that appellant had stolen a total of $34,500.  Garrett also testified that when they
arrested appellant, officers found a fake social security card bearing the name
AScott Mark Lamb.@  On cross-examination, Garrett testified that
the number on the card actually belonged to Scott Anthony Lamb. 








The true Scott Lamb also testified at trial.  Lamb testified that the number on appellant=s fake card was indeed Lamb=s social security number, that he had
never given appellant permission to use his social security number, and that he
had never used the name Scott Mark Lamb. 
On cross-examination, Lamb admitted that appellant did not steal cash
from him, but he stated that appellant had stolen his credit.  On cross-examination, appellant  also tried to establish that the fake social
security card was simply a novelty card that he had bought in Houston.

William McCown, Diamond=s director of
personnel services, testified that the company had no employment records for
Kelvin Clandus Johnson or any of appellant=s aliases.  Similarly, Theresa Ancelett, the director of
administrative services for Memorial Hermann Healthcare, testified that Scott
M. Lamb had never been a patient at any of the Hermann hospitals.  Ancelett also testified that notable
discrepancies existed between the documents that appellant had given to Edwards
and the documents the hospitals use; for example, appellant=s records
displayed a different size font, listed an incorrect area code and office
hours, and improperly included information about medical procedures on the
bill.  Finally, according to the
affidavits of the custodians of business records for the University of South
Alabama, Dr. Meyer, Dr. Blackwell, and Dr. Criswell, appellant had never
been  one of their patients.

After the State rested, appellant called
prosecutor Harry Lawrence, who was trying the case, as his only defense
witness.  Lawrence acknowledged that he
had not  witnessed the thefts firsthand
and repeatedly explained the functions of indictments and grand juries.  Appellant again argued that the matter should
be pursued in civil, not criminal, court.  


The trial court denied appellant=s motion for an
instructed verdict of not guilty.  The
jury convicted appellant and sentenced him to twenty years= confinement and a
$10,000 fine.  On appeal, appellant
argues that (1) the evidence is legally and factually insufficient to support
his conviction and (2) the trial court erred by allowing him to represent
himself. 

Standards of Review: Legal and
Factual Sufficiency








In evaluating the legal sufficiency of the evidence, we must
view the evidence in the light most favorable to the verdict and determine
whether any rational trier of fact could have found the essential elements of
the offense beyond a reasonable doubt.  Vasquez
v. State, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002).  This standard of review applies to cases
involving both direct and circumstantial evidence.  King v. State, 895 S.W.2d 701, 703
(Tex. Crim. App. 1995).  Although we
consider all evidence presented at trial, we may not re-weigh the evidence and
substitute our judgment for that of the jury. 
King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).  The jury is the exclusive judge of the
credibility of witnesses and of the weight to be given their testimony, and it
is the exclusive province of the jury to reconcile conflicts in the evidence.   Wesbrook v. State, 29 S.W.3d 103, 111
(Tex. Crim. App. 2000).

In a factual sufficiency review, the reviewing court must
view all the evidence in a neutral light and determine whether the jury was
rationally justified in finding guilt beyond a reasonable doubt.  Zuniga v. State, 144 S.W.3d 477, 484
(Tex. Crim. App. 2004).  Evidence is
factually insufficient if, when considered by itself, the evidence supporting
the verdict is too weak to support a finding of guilt beyond a reasonable doubt
and thus renders the conviction clearly wrong and manifestly unjust.  Id. at 85; Vasquez, 67 S.W.3d
at 236 (Tex. Crim. App. 2002). 
Alternatively, evidence is factually insufficient if the evidence
contrary to the verdict is strong enough that the beyond-a-reasonable-doubt
standard cannot be met, even if evidence supporting guilt outweighs the
evidence to the contrary.  Zuniga,
144 S.W.3d at 484.  The reviewing
court may not substitute its own judgment for that of the jury and may not
intrude upon the jury=s role as the sole judge of the weight and
credibility of witness testimony.  Vasquez, 67 S.W.3d at 236.

Definition of Aggregated Theft








The jury found appellant guilty of aggregated theft
of more than twenty-thousand dollars and less than one-hundred-thousand
dollars.   Theft is
defined as the appropriation of property, including money, with the intent to
deprive the owner of the property and without the owner=s effective consent.  Tex.
Pen. Code Ann. ' 31.03(a), (b)(1) (Vernon Supp. 2005).  Consent is not effective if induced by
deception.  Tex. Pen. Code Ann. ' 31.01(3)(A) (Vernon Supp. 2005);
Ellis v. State, 877 S.W.2d 380, 382 (Tex. App.CHouston [1st Dist.] 1994, pet. ref=d). 
Deception can be creating a false impression or promising performance
that is likely to affect the judgment of another in the transaction and that
the actor does not intend to perform or knows will not be performed.  Tex.
Pen. Code Ann. ' 31.01(1)(A), (E). 

When a defendant has committed multiple thefts over a period
of time, the thefts may be considered as one crime if they were committed
pursuant to one scheme or continuing course of conduct.  Tex.
Pen. Code Ann. ' 31.09 (Vernon 2003). 
Section 31.09 provides:  AWhen amounts are obtained in
violation of this chapter pursuant to one scheme or continuing course of
conduct, whether from the same or several sources, the conduct may be
considered as one offense and the amounts aggregated in determining the grade
of the offense.@

Appellant argues that the evidence is
legally and factually insufficient because (1) it fails to prove the existence
of one scheme and continuing course of conduct; and (2) it fails to prove that
appellant stole money and one check, with a combined total of at least $20,000,
from one particular complainant.  We
disagree.

AOne Scheme and
Continuing Course of Conduct@

While appellant concedes that his interaction with each
complainant Awas similar in nature to achieve the
objective goal of loan or advance of money in order to take and pursue a legal
litigation,@ he argues that the evidence is
legally and factually insufficient to establish that his acts constituted one
scheme or continuing course of conduct.  
Accusing the State of Aoverstepp[ing] the logic of the law in an effort to punish
appellant beyond the range possible for the crimes committed,@ appellant contends that the
similarities of the offenses fail to establish that Aany of these complainants are
connected to each other in a continuing scheme.@ Although appellant cites no
authority for this argument, we will address this point briefly.








When interpreting a statute, a court must construe words and
phrases according to the rules of grammar and common usage unless they have
acquired a technical or particular meaning. 
Ex Parte Ruthart, 980 S.W.2d 469, 472 (Tex. Crim. App.
1998).  In drafting section 31.09, the
legislature did not attach a technical or particular meaning to Ascheme@ or Acontinuing course of conduct@; 
thus, we must give the words their common meaning.  See Tex.
Pen. Code Ann. ' 31.01 (Vernon 2005); ' 31.09 (Vernon 2003); Sendejo v.
State, 676 S.W.2d 454, 456  (Tex.
App.CFort Worth 1984, no writ.)

We find that a rational juror could have found that appellant=s acts constituted one scheme or
continuing course of conduct.  Over a
ten-month period, appellant told all seven attorneys that he used to work for
Diamond and that he and a coworker had been injured while unloading pipes on an
oil rig, usually called the Ocean Nugget. 
Appellant=s comatose coworker usually was named John Dubois, and
appellant frequently claimed that Dubois=s wife Mary also needed
representation.  In most instances,
appellant claimed that Diamond had offered a settlement.  Appellant also consistently stated that he
had injured his knee, leg, and back, and that he needed further surgery;
appellant typically claimed that Dr. Criswell was going to perform the
operation.  Furthermore, appellant
repeatedly lamented that he needed money to care for his wife, who usually was
named Vanessa, and their four children. 
Appellant always requested large sums of money from the complainants and
disappeared after receiving the money. 
Appellant used the same alias with several complainants, and he
routinely mentioned certain other characters in his various accounts, including
Michael Henison/Henderson, Mr. Bradley, Dr. Blackwell, and Chris Hamilton.  Appellant presented no evidence at trial that
controverted these facts. 








Viewing the evidence in the light most favorable to the
verdict and in a neutral light, we find it to be legally and factually
sufficient to establish that appellant committed the thefts pursuant to one
scheme or continuing course of conduct.  See
Ellis, 877 S.W.2d at 382-83 (finding evidence sufficient to support
conviction for aggregated theft when appellant, who operated a loan company
purporting to help people with poor credit to buy cars, took down payments from
eight complainants and failed to provide complainants with cars or refunds); Noor
v. State, No. 01-02-01148-CR, 2004 WL 744575, at *3-4 (Tex. App.CHouston [1st Dist.] April 8, 2004, no
pet.) (not designated for publication) (holding that appellant=s acts constituted a continuing
course of conduct when appellant offered to sell discounted merchandise to four
complainants, explained that he had acquired the merchandise from a grocery
store, requested cash prior to the exchange, met the complainants near a hotel
or shopping center, and entered the hotel or shopping center under the guise of
retrieving the goods but never returned).

AMoney and One Check@

Secondly, appellant argues that the evidence is legally and
factually insufficient because the State failed to prove that appellant stole Amoney and one check,@ whose combined total was at least
$20,000, from one particular complainant. 
According to appellant, the State was required to prove this combination
because it used the conjunctive term Aand@ to connect the words Amoney@ and Aone check@ in the indictment.  Similarly, appellant argues that the jury charge,
which used the disjunctive term Aor@ between the complainants= names, also required the State to
prove that appellant stole Amoney and one check,@ whose combined total is at
least  $20,000, from one particular
complainant, rather than from the complainants collectively.[7]  Although appellant again cites no authority
for his arguments, we will address these points briefly as well.

We find that the State was not required to prove that
appellant stole Amoney and one check,@ whose combined total is at least
$20,000, from only one complainant.  In a
theft case, the allegedly stolen property must be generally described in the
indictment and conforming evidence must be adduced.  Lehman v. State, 792 S.W.2d 82, 84
(Tex. Crim. App. 1990).  However, the
State need not show that the accused stole every piece of property
described in the indictment in order to secure a valid conviction.  Id. (emphasis in original).  As the Lehman court explained:








[The State] must prove theft of
property described in the indictment in an amount sufficient to satisfy the
jurisdictional requirement of its pleading. 
According to this theory, if a defendant is charged with stealing AA, B, and C, widgets of an aggregate
value greater than $750.00 but less than $20,000.00,@ the State need only prove that
defendant stole widgets worth between $750.00 and $20,000.00 from among widgets
A, B, and C.

The Lehman court also remarked that once a defendant Ahas been given proper notice that he
must prepare to defend himself against a charge that he has stolen a certain >bundle= of property, there is no reason that
he should be acquitted if the evidence shows him guilty of stealing enough of
the >bundle= to make him guilty of the offense
charged.@ 
Id.  Furthermore,  it is proper for the State to plead
alternative Amanner or means@ in the conjunctive when proof of any
one Amanner or means@ will support a guilty verdict.  Id.; see also State v. Weaver,
945 S.W.2d 334, 335 (Tex. App.CHouston [1st Dist.] 1997) (holding that the State is not
required to prove each individual theft that makes up an aggregate theft
allegation as long is it demonstrates that enough of the property from the
indictment was stolen to satisfy the aggregate value allegation), aff=d, 982 S.W.2d 892 (Tex. Crim. App. 1998); Harrell
v. State, 834 S.W.2d 540, 543 (Tex. App.CHouston [14th Dist.] 1992, pet. ref=d) (holding that when the indictment
in an aggregated theft case alleged eighty-three checks made payable to
defendant, the State needed to prove only an aggregated value, not each
individual theft).  Finally, it is proper
for the jury to be charged in the disjunctive when the indictment uses the
conjunctive to allege different methods of committing the offense.  Kitchens v. State, 823 S.W.2d 256, 258
(Tex. Crim. App. 1991). 








Accordingly, we find that the phrasing of the indictment and
the jury instructions did not require the State to prove that appellant stole Amoney and one check,@ whose combined total was at least $20,000,
from only one complainant.  We also find
that a rational jury could have found that appellant stole Aa bundle@ of at least $20,000 from the
complainants collectively.  The complainants= testimony revealed that appellant
took $4,000 from Nobles, $5,000 from Hughes, $5,000 from Parks, $6,000 from
Stephens, $6,000 from Dunne, $5,500 from Boyd, 
and $3,000 from Edwards; Detective Garrett also testified that the total
amount stolen was $34,500.  There is no
evidence that appellant did not take the money; at trial, appellant simply
argued that the case should be tried in civil, not criminal court, and he also
tried to diminish the witnesses= credibility by proving that they had not signed
affidavits.  Viewing the evidence in the
light most favorable to the verdict and in a neutral light, we find it to be
legally and factually sufficient to support appellant=s conviction for aggregated theft
greater than twenty-thousand dollars and less than one-hundred-thousand
dollars.  Therefore, we overrule
appellant=s first and second points of error.

Waiver of Right to Counsel

In his third point of error, appellant
argues that the court erred by allowing appellant to represent himself at
trial.  Essentially, appellant argues
that his waiver of his right to counsel was not knowing and intelligent because
the trial court failed to conduct a proper Faretta hearing.[8]  We disagree.








A defendant has a constitutional right to
proceed without the assistance of counsel when he or she voluntarily and
intelligently elects to do so.  Faretta
v. California, 422 U.S. 806, 818-20 (1975). 
The decision to proceed pro se is made knowingly and
intelligently if it is made with a full understanding of the right to counsel,
which is being abandoned, as well as the dangers and disadvantages of self-representation.  Id. at 834-36.  This means that the trial court must
thoroughly admonish the defendant, so that the record reflects that the
defendant Aknows what he is doing and his choice is
made with eyes open.@  Id.  There is no specific formula that establishes
a knowing and intelligent waiver; however, a trial judge must actively assess a
defendant=s waiver of counsel.  Blankenship v. State, 673 S.W.2d 578,
583 (Tex. Crim. App. 1984).  Furthermore,
courts must indulge every reasonable presumption against the validity of such
waiver.  Jordan v. State, 571
S.W.2d 883, 884 (Tex. Crim. App. 1978).

We find that appellant knowingly and
intelligently waived his right to counsel. 
The trial court thoroughly admonished appellant, and appellant confirmed
that he understood the admonishments.  In
Collier v. State, the Court of Criminal Appeals examined the
admonishments given by the trial court and held that the defendant knowingly
and intelligently waived his right to counsel. 
959 S.W.2d 621, 626 (Tex. Crim. App. 1997).  In Collier, the trial court explained
that the defendant, who had earned his GED (General Educational Development),
was required to follow the rules of evidence and procedure without any special
consideration and warned that as a result, the defendant might be disadvantaged
at trial and in any consequent appeal.  Id.  The trial court also explained the nature of
the charges against Collier, the fact that lesser included offenses might be
submitted to the jury, and the possible range of punishment.  Id. 
Finally, the court repeatedly tried to impress upon Collier Athe extreme gravity
of his request to proceed pro se and the likelihood that it was a
serious mistake.@  Id.  

Similarly, in the instant case, appellant
answered affirmatively when the court asked whether he understood the charges
against him and the possible punishment ranges. 
When asked to articulate them, appellant stated: AThere are three
cases, each are [sic] third degree felonies are [sic] enhanced by one prior
true felony which makes the punishment range two years to twenty years in the
punishment and a ten thousand dollar fine.@  When appellant expressed uncertainty about
the punishment range of the last offense, the district attorney retrieved the
file, which included the most recent cause number for the third case and a copy
of the indictment.  Additionally,
appellant acknowledged that he would be required to serve the punishment
assessed by the jury if his conviction were upheld on appeal.








Although appellant had not earned a GED as
Collier had, he stated that he had completed school through the ninth grade and
was Awell-equipped like
a person who graduated.@ 
Appellant also stated that he had never been found incompetent or
insane, had never been treated for a mental illness, and had previously
represented himself in a post-conviction writ and a theft charge that was dismissed
before trial.

As in Collier, the court told
appellant that he must abide by all the legal rules applicable to criminal
cases and that he would not Aget any special
breaks,@ which appellant
acknowledged.  Appellant also understood
that the prosecutor was a licenced, experienced attorney.  When the court asked about the extent of
appellant=s Aknowledge of
specific rules of criminal cases and what things you will have to do to
represent yourself,@ appellant responded that he must file
motions, question witnesses, and occasionally make objections.  When appellant demonstrated his confusion
about the voir dire process, the court informed him that negotiation was not
allowed.  

Appellant asserted that he was familiar
with the Rules of Evidence and the Rules of Criminal Procedure because he had
begun to study Athe Texas law books@ and Aa lot of federal
government books@ four years earlier.  Appellant acknowledged that he needed to
follow these rules at trial and appeared to understand that the jury would not
learn certain facts if he failed to do so. 
Appellant also understood that conducting his defense required more than
simply telling the jury his side of the story and agreed when the court
cautioned that appellant=s conduct at trial Awould be of
critical importance to the outcome of [his] case.@








Appellant stated several times that he did
not want Muhammed to represent him, and he responded affirmatively when the
court asked whether he had the Amental capacity to
freely and voluntarily waive [his] right to representation by Mr. Muhammed and
represent [himself] at trial.@  Appellant also responded affirmatively when
the court asked: ADo you freely and voluntarily waive your
right to have Mr. Mohammed [sic] represent you in trial of these cases and
telling [sic] this court that you still wish to represent yourself in trial of
these cases?@ 
Additionally, even though the court granted appellant=s request for more
time to conduct research, it warned that Aeven with all the
time in the law library that you want I don=t think you=ll be ready to try
a case in felony court.@ The trial court ultimately appointed
Muhammed as standby counsel, although appellant did not consult with him at
trial.  

The record reflects that the trial court
thoroughly admonished appellant and that appellant understood the consequences
of proceeding to trial without the assistance of counsel.  Therefore, because we find that the evidence
is sufficient to support a finding that appellant=s waiver was
knowing and intelligent, we overrule appellant=s third and final
point of error. See Collier, 959 S.W.2d 621 at 626; Kristopher v.
State, No. 14-97-01210-CR, 2000 WL 767700, at *4 (Tex. App.CHouston [14th
Dist.] June 15, 2000, pet. ref=d) (not designated
for publication) (holding that appellant knowingly and intelligently waived
right to counsel after trial court questioned appellant about her education,
explained that appellant would be required to follow technical rules of
evidence and procedure without special consideration, informed appellant of the
pending charges and possible ranges of punishment, and tried to impress upon
appellant that representing herself was likely a mistake).  Because we find the evidence to be both
legally and factually sufficient to support appellant=s conviction for
aggregated theft, and because we find that appellant knowingly and
intelligently waived his right to counsel, we affirm the conviction.

 

 

_____________________________

Adele Hedges

Chief Justice

 

 

 

 

Judgment
rendered and Opinion filed January 17, 2006.

Panel
consists of Chief Justice Hedges and Justices Yates and Anderson.

Publish
C Tex. R. App. P. 47.2(b).

 

 











[1]  These attorneys were complainants
Bill Edwards, Larry Boyd, D=Juana Parks, Gerry Dunne, J.P. Jay Hughes, James W. Nobles,
Jr., and R. Gary Stephens.  Complainant Robert Zeither owned the funding
service that Dunne used to advance money to appellant.  Complainant Charlie Johnson worked as an investigator for
Edwards.





[2]  In one
account, the co-worker=s name was Chris Hamilton.





[3]  In one
account, the surgeon=s name was Dr. Wallace, and in another, it was Dr.
Blackwell.





[4]  In two
accounts, appellant claimed that his wife=s name
was Rosalyn; however, most of the time he used the name Vanessa.  Additionally, appellant usually claimed that
the youngest child was a seven-and-a-half or eight-and-a-half week-old baby.





[5]  Hughes
testified that appellant had asked him to wire money to him before they had met
in person; however, Hughes informed appellant that he did not advance money to
people unless an attorney/client relationship existed between them.





[6]  Appellant
actually received $5,704.76 because fees were deducted from the $6,000.





[7]  Appellant
insinuates that the State=s use of the disjunctive and its failure to object to
the jury charge elevated its burden of proof. 
However, appellant neither cites authority for this assertion nor
explains his reasoning.  Therefore, we
will not consider this argument.  See Tex. R. App. P. 38.1(h).





[8]  Appellant asks the court to
establish Aa >bright line= of questions that should be asked
of persons that want to represent themselves, pro se@ in order to insure that they can
competently represent themselves.  We
decline to do so, as the law in this area is well-established.  Further, appellant=s argument that pro se defendants
should be questioned to determine whether they can competently represent
themselves is misplaced.  The Sixth
Amendment guarantee of the right to assistance of counsel includes the right to
represent oneself.  U.S. Const. amend. VI; Faretta v. California, 422 U.S. 806, 835 (1975). Thus, the determination to be made by the trial judge is whether the
defendant is competent to make the decision to waive his right to counsel, not
whether he can competently represent himself in a legal proceeding.  Faretta,  422 U.S. at 835-36.  To hold otherwise would, in effect, deny the
defendant his right to waive counsel.

Appellant also
complains that he did not have adequate notice of the charges against him
because he never saw a motion to quash the indictment.  However, the record indicates that appellant
received a copy of the indictment itself at the Faretta hearing.